22-MJ-5180-JGD

## AFFIDAVIT OF SPECIAL AGENT BRITTANY CHANDLER IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

I, Special Agent Brittany Chandler, being duly sworn, hereby state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent with United States Department of Homeland Security, Immigrations and Customs Enforcement, Homeland Security Investigations (HSI), assigned to the office of the Special Agent in Charge (SAC) New England. I have been employed by HSI since 2020 and assigned to the Child Exploitation and Forensics Group since 2022. As part of my duties, I am authorized to investigate violations of the laws of the United States, including criminal violations relating to child exploitation, child pornography, coercion and enticement, and transportation of minors. My formal law enforcement training includes successfully completing the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training at the Federal Law Enforcement Training Center in Glynco, Georgia. I have received both formal and on the job training in the investigation of child pornography and have reviewed examples of child pornography as defined in 18 U.S.C. 2252. Prior to my tenure as a Special Agent, I was employed as an Intelligence Supervisor with the Massachusetts State Police. I was employed by the Pennsylvania Office of the Attorney General as an Investigative Analyst assigned to the Bureau of Narcotics Investigation. Concurrent with my employment as an Investigative Analyst and Intelligence Supervisor, I served as an all-source intelligence analyst and intelligence officer in the Air National Guard. My education includes a Bachelors in History, a Bachelors in Homeland Security, and a Masters in Global Security and Intelligence.

1

## PURPOSE OF AFFIDAVIT

2.     This affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search the premises located at 24 High Street, in Chelsea, MA (the "SUBJECT PREMISES"), as described in Attachment A.  Based on the information contained herein, there is probable cause to believe that the SUBJECT PREMISES contain evidence, fruits, and instrumentalities, of violations of Title 18 United States Code Section 2252A (possession, distribution, and receipt of child pornography) (the "TARGET OFFENSES"), as fully described in Attachment B.

3.     The statements in this Affidavit are based in part on my personal observations, involvement in the below-described investigation, review of records, information provided by other law enforcement officers, and communications with others who have knowledge of the events and circumstances described herein. In submitting this affidavit, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish the requisite probable cause for the requested search warrant.

## STATEMENT OF PROBABLE CAUSE

### *Identification of Child Pornography Distribution*

4.     Beginning on or about June 2021, Task Force Officer (TFO) Lawrence James, assigned to HSI New England, conducted an online investigation into the use of peer-to-peer [1] (P2P) file sharing program on the BitTorrent [2] network on the Internet to identify persons that

---

[1]   Peer to Peer (P2P) file sharing allows people using P2P software to download and share files with other P2P users using the same or compatible P2P software. P2P software is readily available on the Internet and often free to download. Internet-connected devices running P2P software form a P2P network that allows users on the network to share digital files.

[2]   BitTorrent is one of the many P2P networks. For a user to become part of the BitTorrent

distribute child pornography. During the course of his investigation, TFO James began to examine the Internet Protocol (IP) address[3] 73.89.237.29. The device connected to this IP address will hereinafter be referred to as the "Suspect Device." The user of this IP address was utilizing BitTorrent to disseminate large quantities of child pornography.

5.    Specifically, on more than 85 occasions ranging from approximately June 2021 to April 2022, TFO James located the Suspect Device on the BitTorrent network and observed it was offering to share suspected child pornography torrent files.[4] I have conducted a review of the files directly downloaded from the Suspect Device and observed child pornography contained within the majority of the files.

6.    On Sunday, June 20, 2021, TFO James, using a computer running law enforcement

---

network, the user must first obtain BitTorrent software and install it on a device. When the BitTorrent software is running and the device is connected to the Internet, the user will be able to download files from other users on the network and share files from their device with other BitTorrent users.

[3]  Internet Protocol (IP) address is a numerical label assigned to each device participating in a computer network that uses the Internet Protocol for communication. Computers on the Internet identify each other by an IP address. IP addresses can assist law enforcement in finding a particular computer on the Internet. IP addresses can typically lead law enforcement to a particular Internet service company and that company can typically identify the account that used the IP address to access the internet.

[4]  Users of the BitTorrent network wishing to share new content will use a BitTorrent program to create a "torrent" file for the file or group of files they wish to share. A torrent file is a small file that contains information about the file(s) and provides a method for a user to download the file(s) referenced in the torrent from other BitTorrent users. Torrent files are typically found as the result of keyword searches on the Internet sites that host or link to them. To download file(s) from other users on the BitTorrent network, a user typically obtains a torrent file. The BitTorrent software processes the information in the torrent file and locates devices on the BitTorrent network sharing all or parts or the actual file(s) being sought. The download of the content referenced in the torrent is achieved after the requesting computer and the sharing computer(s) directly connect to each other through the Internet using the BitTorrent P2P software. The BitTorrent network download process actually makes a copy of the selected file(s) for the device seeking the download, leaving the original file(s) on the host computer.

investigative BitTorrent software, directed the investigative focus to a device at the IP address 73.89.237.29. The software located a torrent file having an "info hash"[5] value of 4b9c09abd6e61dde158969d83d351d4a0c5XXXXX.[6] This torrent file references one file that was identified by investigative software as suspected child pornography, based upon the info hash information in the torrent file. The Suspect Device was the sole candidate for the download, as such, the file was downloaded by law enforcement directly from IP address 73.89.237.29.[7] On Sunday, June 20, 2021, between 21:45 hours and 21:55 hours, a direct connection to the Suspect Device through BitTorrent's P2P software was made and a download of the file that the Suspect Device was making available was successfully completed.

7.     The file referenced in Paragraph 6 was one video in its entirety. I have reviewed the video directly downloaded from the Suspect Device and believe that it meets the federal definition of child pornography. The following is a description of the video that I viewed.

    a.  Filename: julyjailbait.club - PTHC BDSM mistress and young girl part 1.mp4: The video is approximately 5 minutes and 43 seconds in length that depicts a female child wearing a diaper, that based upon the child's overall body size, lack of any breast development, and no independent mobility, appears to be approximately 1-2 years old, and an adult female. The adult female is sitting on what appears to be a mattress, facing the camera, and is completely nude except a pair of underwear and a masquerade mask.

---

[5]  Torrent files may be referenced by their "info hash," which uniquely identifies the torrent based on the file(s) associated with the torrent file.

[6]  The full "info hash" has been omitted but is known to law enforcement.

[7]  The Suspect Device reported it was using BitTorrent client software -LT1000.

The child is laying on the mattress in front of the adult female who removes the child's diaper. The adult female pours what appears to be lubricant over the child. The adult female inserts a device into the anus of the child. The adult female gets off the mattress and returns with rods and straps. The adult ties the child's ankles to the bar and suspends the child upside down with the rod the child is strapped to. The adult female then tapes the child's wrists to the mattress and places a piece of tape over the child's mouth. The adult female places clamps on the child's nipples and the child's genitals and slaps the child's genitals and buttocks repeatedly. The adult female leaves the mattress and returns with a lighter and lights an object on fire, then holds the lit object to the child's knees. The child appears to be crying during the entire video.[8]

8.    On Friday, December 10, 2021, TFO James, using a computer running law enforcement investigative BitTorrent software, directed the investigative focus to a device at the IP

---

[8]   I am aware that the "preferred practice" in the First Circuit is that a magistrate judge view images that agents believe constitute child pornography by virtue of their lascivious exhibition of a child's genitals. *United States v. Brunette*, 256 F.3d 14, 17-19 (1st Cir. 2001) (affiant's "legal conclusion parroting the statutory definition […] absent any descriptive support and without an independent review of the images" insufficient basis for determination of probable cause). Here, however, the descriptions offered "convey to the magistrate more than [my] mere opinion that the images constitute child pornography." *United States v. Burdulis*, 753 F.3d 255, 261 (1st Cir. 2014) (distinguishing *Brunette*). The children described herein are as young as 1-2 years old. Furthermore, the descriptions of the files here are sufficiently specific as to the age and appearance of the alleged children as well as the nature of the sexual conduct pictured in each file, such that the Court need not view the files to find that they depict child pornography. *See United States v. Syphers*, 426 F.3d 461, 467 (1st Cir. 2005) ("The best practice for an applicant seeking a warrant based on images of alleged child pornography is for an applicant to append the images *or provide a sufficiently specific description of the images* to enable the magistrate judge to determine independently whether they probably depict real children.") (emphasis added); *see also United States v. LaFortune*, 520 F.3d 50, 56 (1st Cir. 2008) (similarly emphasizing *Syphers* court's use of "or" in describing the *Brunette* "best practice"). Where I have included such nonconclusory, sufficiently specific descriptions, this Court need not view the imagery to find that they depict child pornography. Nonetheless, the described imagery is available for review at the Court's request.

address 73.89.237.29. The software located a torrent file having an "info hash" value of 6adc2cc123b3d59e0b3f651dae91790f498XXXXX.[9] This torrent file references one file that was identified by investigative software as suspected child pornography, based upon the info hash information in the torrent file. The Suspect Device was the sole candidate for the download, as such, the file was downloaded directly from IP address 73.89.237.29.[10] On Friday, December 10, 2021, between 13:06 hours and 13:08 hours, a direct connection to the Suspect Device through BitTorrent's P2P software was made and a download of the file that the Suspect Device was making available was successfully completed.

9. The file referenced in Paragraph 8 was one video in its entirety. I have reviewed the video directly downloaded from the Suspect Device and believe that it meets the federal definition of child pornography. The following is a description of the video that I viewed.

   a. Filename: [Stars & Stripes] - [JulyJailbait] - [jjclubumn7vkhyuw.onion] - video 00128 girl blowjob pthc video.mp4: The video is approximately 8 minutes and 55 seconds in length and depicts a naked, prepubescent female child, who based upon on overall size of the child's body, child-like facial features, and lack of breast development appears to be approximately 5-8 years old, and a naked adult male. The female child is kneeling in front of the adult male with an erect penis. The child performs oral sex on the adult male. The adult male ejaculates into the female child's mouth.

10. On Sunday, April 17, 2022, TFO James, using a computer running law enforcement investigative BitTorrent software, directed the investigative focus to a device at the IP address 73.89.237.29. The software located a torrent file having an "info hash" value of

---

[9]   The full "info hash" has been omitted but is known to law enforcement.

[10]   The Suspect Device reported it was using BitTorrent client software –tT1730-tTorrent v1.7.3.

7bc838c273060cbeb83523e1830e0570e64XXXXX.[11] This torrent file references 12 files, at least one of which was identified by investigative software as suspected child pornography, based upon the info hash information in the torrent file. The Suspect Device was the sole candidate for each download, as such, each file was downloaded directly from IP address 73.89.237.29.[12] Between Sunday, April 17, 2022, at 18:30 hours and Monday, April 18, 2022, at 00:00 hours, a direct connection to the Suspect Device through BitTorrent's P2P software was made and a download of the nine files the Suspect Device was making available was successfully completed. Of the nine files, five are videos.

11.    I have reviewed the five videos referenced in paragraph 10 and believe that they meet the federal definition of child pornography. The following is a description of one of the videos that I viewed.

    a.    Filename: 3f91d4fd2fef2bec0ca068515376d4ab - anal falko girl man oral pthc sound teach_me_to_fuck toys.wmv: The video is approximately 6 minutes and 46 seconds. This video depicts a naked adult male laying on his back with a naked, prepubescent female child, who based upon the child's overall size, child-like facial features, lack of breast development and pubic hair, appears to be approximately 3-6 years of age sitting on the adult male's stomach. The adult male is rubbing his erect penis on the child's vagina. The video cuts to a new scene with a naked adult male with an erect penis and a naked child approximately 3-6 years of age. The child performs oral sex on the adult male. The video cuts to a new scene where a naked adult male inserts his erect penis into the anus of a naked female child approximately 3-6 years old. The video cuts to a

---

[11]   The full "info hash" has been omitted but is known to law enforcement.

[12]   The Suspect Device reported it was using BitTorrent client software -tT1810- tTorrent    v1.8.1.

7

new scene where a naked female child, approximately 3-6 years old, is sitting on a bed with her legs spread and an adult is masturbating the child's clitoris. The child is then bent over on her hands and knees on the bed with her buttocks in the air. An adult male inserts an object into the child's anus. A naked adult male then inserts his erect penis into the child's anus. The child and surrounding area appear to be the same throughout the video.

<u>*HSI Identifies the Subject Premises and its Residents*</u>

12.     An online query utilizing the American Registry for Internet Numbers (ARIN) for the IP address 73.89.237.29 was conducted in an attempt to determine its origin. The query revealed that IP address 73.89.237.29 is registered to Comcast Cable Communications, LLC (Comcast).

13.     On or about March 30, 2022, I sent an administrative summons to Comcast for subscriber information for IP address 73.89.237.29. In response, Comcast provided the following subscriber information:

> Subscriber Name: Marcelle Russo[13]
> Service Address: 24 High Street, Chelsea, MA 02150
> Telephone Number: (617) 391-9226
> Start of Service: 7/3/2020

14.     Public records indicate that Marcelle Russo was the grandmother of Nicole Gigante-Celeste (Gigante-Celeste). Public records accessed through a database available to law enforcement revealed that the current property owners for 24 High Street, in Chelsea, Massachusetts are John Celeste and Gigante-Celeste. Public records indicate the home is a single-family residence; however, according to multiple police reports, Gigante-Celeste

---

[13] Marcelle Russo is deceased.

has been known to rent out rooms in the SUBJECT PREMISES. According to the United States Postal Service, Gigante-Celeste receives mail at the SUBJECT PREMISES. Gigante-Celeste does not have a criminal history.

15. Information held by the Massachusetts Registry of Motor Vehicles (RMV) revealed that Mark Killion (Killion) (DOB: xx/xx/1960) holds a suspended Massachusetts driver's license with a residential and mailing address of 24 High Street, Apt 2, Chelsea, MA 02150. Based upon law enforcement records, Killion's home address has been listed as the SUBJECT PREMISES since approximately 2018. According to a police report in 2021, where law enforcement responded to the SUBJECT PREMISES, Gigante-Celeste advised law enforcement that Killion had "been renting a room from her for several years." In this report, Killion's address is listed as 24 High Street, #2, and Gigante-Celeste's address is listed as 24 High Street, #1. According to records held by the Massachusetts Board of Probation, Killion has a criminal history in Massachusetts. His criminal history lists over 40 separate charges in relation to Breaking and Entering, Larceny, Receiving Stolen Property, and Trespassing.

16. Information held by the Massachusetts RMV revealed that Lasall Johnson (DOB: XX/XX/1968) holds a suspended Massachusetts Driver's License with a residential and mailing address of 24 High Street, Chelsea, MA 02150. Johnson is the registered owner of a 2008 brown Saturn Aura, bearing Massachusetts registration 2JJN44, registered to the same address.

17. According to records held by the Massachusetts Sex Offender Registry Board (SORB), Johnson is a lifetime registered, Level 2 sex offender. Johnson last self-reported in June 2021. He reported that his address is the SUBJECT PREMISES, and the 2008 brown

Saturn Aura, bearing Massachusetts registration 2JJN44, is registered to him, which is the same vehicle referenced in Paragraph 16 that is registered to Johnson at the SUBJECT PREMISES according to Massachusetts RMV records.

18. According to records held by the Massachusetts Board of Probation, Johnson has a criminal history in Massachusetts. His criminal history lists over approximately eight charges in Massachusetts for Sex Offender Failure to Register. Johnson's criminal history reveals that Johnson was charged in the Norfolk Superior Court with one count of Indecent Assault and Battery on a Child, one count of Indecent Assault and Battery, and two counts of Rape of a Child in 1988 that were ultimately dismissed or nolle pros. Additionally, Johnson was charged and ultimately convicted in 1989 of two counts of Assault to Rape.

19. Based upon my review of records, I believe that Gigante-Celeste, Killion, and Johnson may all reside at the SUBJECT PREMISES.

### *Surveillance of Subject Premises*

20. On March 29, 2022, I conducted surveillance at the SUBJECT PREMISES. During the surveillance, I observed a Saturn sedan, bearing Massachusetts registration 2JJN4, parked across the street from the SUBJECT PREMISES, which is the same vehicle referenced in Paragraphs 16 and 17 that is registered to Johnson.

### *Chelsea Police Department Conducts Sex Offender Registry Address Verification*

21. On June 13, 2022, Chelsea Police Department (CPD) Detectives conducted a Sex Offender Registry address verification check for Johnson at the SUBJECT PREMISES. According to CPD Detectives, upon arrival at the SUBJECT PREMISES, detectives knocked on the front door of the SUBJECT PREMISES and an unidentified female answered the door. CPD Detectives asked to speak to Johnson. The unidentified female indicated she would

have Johnson come to the door. Johnson exited the SUBJECT PREMISES a few minutes later. CPD Detectives identified themselves and advised Johnson that they were conducting an address verification check related to Johnson's SORB registration. CPD Detectives asked Johnson if the SUBJECT PREMISES was Johnson's current address and to provide identification. Johnson advised CPD Detectives that the SUBJECT PREMISES was his current address and provided CPD Detectives with a Massachusetts RMV driver's license that displayed his name, date of birth, address, and photograph. The address listed on the RMV driver's license was the SUBJECT PREMISES. At the conclusion of the address verification check, Johnson re-entered the SUBJECT PREMISES.

## CHARACTERISTICS COMMON TO CONSUMERS OF CHILD PORNOGRAPHY

22.     As a result of my training and experience, and from conversations with other members of law enforcement, related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who possess, receive, distribute, or access with intent to view child pornography (collectively, "consumers" of child pornography) have a sexual interest in children and in images of children. Based upon my knowledge, experience, training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to such consumers of child pornography, as outlined in the following paragraphs.

23.     The majority of consumers of child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

24.     Consumers of child pornography may collect sexually explicit materials, which may

consist of hard copy and digital images and videos for their own sexual gratification. These individuals often also collect child erotica, which may consist of images or text that do not rise to the level of child pornography, but which nonetheless fuel their deviant sexual fantasies involving children. Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that are used to communicate with others about sexual activity or interest in children. Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant. In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

25.     Many consumers of child pornography maintain their sexually explicit materials for several years and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They regularly maintain their collections in the privacy and security of their homes, inside their cars, on their person, or in cloud-based online storage.[14] Depending on their technical expertise, access to child pornography on seemingly "safe" networks like Tor, or struggle with addiction to child pornography, many consumers of child pornography have been found to download, view, and then delete child pornography on their digital devices on a cyclical and repetitive basis.

---

[14] I know from conversations with agents who have been involved in investigations where, for example, an offender who lived with his parents kept a laptop with child pornography in the trunk of his car; an offender who lived with his parents and sister maintained his child pornography and communications with minors in a cloud-based application that he accessed from multiple phones (one of which he secreted in his work vehicle when he realized law enforcement was searching his home) and tablets; countless offenders who kept thumb drives and digital devices in various locations throughout their homes; and offenders that have been found in possession of more than one phone with child pornography.

26.     Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

27.     Consumers of child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. This contact helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, bulletin boards, chat sites, web forums, instant messaging applications, and other similar vehicles of communication.

28.     Consumers of child pornography often collect, read, copy, or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in written hardcopy, on computer storage devices, or merely on scraps of paper.

29.     Based upon training and experience, and from conversations with other members of law enforcement, related to investigations involving child pornography and the sexual abuse of children, I know that persons engaged in the production and possession of child erotica are also often involved in the production and possession of child pornography. Likewise, persons involved in the distribution, receipt, and possession of child pornography are often

involved in the distribution, receipt, and possession of child erotica.

30.     Based on the foregoing, I submit that the user of the Suspect Device likely displays some of the characteristics common to consumers of child pornography, based upon the fact that large quantities of child pornography were disseminated by the Suspect Device from approximately June 2021 to April 2022 using BitTorrent P2P software that included children as young as one to two years old being physically and sexually abused. Additionally, as outlined above, there is probable cause to believe that the user of the Suspect Device resides at the SUBJECT PREMISES based upon the use of an IP address registered to the SUBJECT PREMISES that was used to share and disseminate child pornography over an extended period of time.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

31.     From my training and experience, and from conversations with other members of law enforcement, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social- networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

32.     As described above and in Attachment B, this  application seeks permission to search for records that might be found at the SUBJECT PREMISES, in whatever form they are found. One form in which the records are likely to be found is data stored on a computer's hard drive, a cellphone, or other storage media. Thus, the warrant applied for would authorize the seizure of computer hardware and/or electronic storage media or, potentially, the

copying of electronically stored information.

33.   Based on my training and experience, and from conversations with other members of law enforcement, I know that many cell phones (which are included in the definition of "hardware" in Attachment B) can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, a digital camera, a portable media player, and a GPS navigation device, on which one can send and receive text messages and emails, access the internet, and store a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

34.   I submit that if a computer or storage medium is found at the SUBJECT PREMISES, there is probable cause to believe that those records referenced above will be stored on that computer or storage medium, for at least the reasons in the following paragraphs.

35.   Based on my knowledge, training, experience, and from conversations with other members of law enforcement, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a.   Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from an old computer to a new computer.

b.   Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage

22-MJ-5180-JGD

medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from the operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is usually required for that task.

d.  Similarly, files that have been viewed over the internet are sometimes automatically downloaded into a temporary internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed internet pages or if a user takes steps to delete them.

e.  Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional

16

information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, and from conversations with other members of law enforcement, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating, or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer

accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate

conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    i.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

36.    Based on my knowledge, training, and experience, as well as on conversations with other members of law enforcement, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software, or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, computer-related documentation, and storage media ("computer equipment") be seized and subsequently processed by a qualified computer specialist in a laboratory setting, rather than at the location where it is seized. This is true due to the following:

    a.    The volume of evidence – storage media such as hard disks, flash drives, CDROMs, and DVD-ROMs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing

it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine what particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to do this analysis on-site.

b. Technical requirements – analyzing computer hardware, computer software, or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, password-protected, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code embedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

37. The SUBJECT PREMISES may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive

determination of their ownership at the premises during the execution of this warrant. If the things described in <u>Attachment B</u> are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it on-site or off-site in order to determine its true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

38.   Law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in <u>Attachment B</u>. If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

## **CONCLUSION**

39.    Based on the foregoing, I respectfully submit that there is probable cause to believe that

evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A, as described in

Attachment B, are located at the SUBJECT PREMISES, as more fully described in

Attachment A.

Sworn to under the pains and penalties of perjury.

Respectfully submitted,

*Brittany Chandler*
Brittany Chandler
Special Agent
Homeland Security Investigations

TELEPHONICALLY
Sworn and subscribed before me this 21st day of June, 2022.

HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### PREMISES TO BE SEARCHED

### Subject Premises: 24 High Street, Chelsea, MA 02150

The SUBJECT PREMISES is described as a two-story single-family home with yellow colored siding and white trim. There is a single-story front porch with white trim over the white front door on the front of the residence. Concrete stairs with wooden stair rails lead up to the landing in front of the front door. To the right of the front door is a three-window bump out. On the second story of the residence there are two windows over the bump out. There is a single window in the peak of the roof on the front of residence. The number 24 is on the left side of the front door. A black porch lamp is to the right of the front door. There is a wooden fence to the right of the residence that leads straight to the sidewalk. There is a chain-link fence to the left of the premises that leads straight to the sidewalk. The SUBJECT PREMISES is pictured below.



22-MJ-5180-JGD

<u>**ATTACHMENT B**</u>

**ITEMS TO BE SEARCHED AND SEIZED**

I.    All records, in whatever form, and tangible objects that constitute evidence, fruits, orinstrumentalities of 18 U.S.C. § 2252A (the "Target Offenses"), including:

    A.    Records and tangible objects pertaining to the following topics:

        1.    Child pornography;

        2.    The sexual abuse of exploitation of children;

        3.    Child erotica;

        4.    The identity of any child depicted in videos and photographs located in the equipment or discussed in any communications related to child pornography or the sexual abuse or exploitation of children;

        5.    Internet activity reflecting a sexual interest in minors or child pornography;

        6.    BitTorrent; and

        7.    Membership in online groups, clubs, or services that provide, make accessible, or otherwise concern child pornography.

    B.    Any communications about child pornography or sexual activity with or sexual interest in minors;

    C.    Internet activity reflecting a sexual interest in minors or child pornography;

    D.    Information concerning the minor subject of any visual depiction of child pornography, child erotica, sexual activity with other minors or adults, or of sexual interest, or that may be helpful in identifying any such minor;

    E.    Address books (virtual and physical), names, and lists of names and addresses of individuals who may have been contacted by use of the computer or by other means for the purpose of committing violations of the subject offenses;

    F.    Any social media account(s) or communication application(s) used to send or receive any communication(s) relating to child pornography, the sexual abuse or exploitation of children, or the identity of any child depicted in videos and photographs;

G.  The identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the Target Offenses;

H.  Membership in online groups, clubs, or services that provide, make accessible, or otherwise concern child pornography; and

I.  The existence of e-mail accounts, online storage, or other remote computer storage.

J.  For any computer hardware, computer software, computer-related documentation,or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

1.  Evidence of who used, owned, or controlled the computer equipment;

2.  Evidence of computer software that would allow others to control the items,evidence of the lack of such malicious software, and evidence of thepresence or absence of security software designed to detect malicious software;

3.  Evidence of the attachment of other computer hardware or storage media;

4.  Evidence of counter forensic programs and associated data that are designedto eliminate data;

5.  Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

6.  Passwords, encryption keys, and other access devices that may be necessaryto access the computer equipment;

7.  Records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media;and

8.  Evidence indicating the computer user's state of mind as it relates to the crime under investigation;

9.  Documentation and manuals that may be necessary to access the computer equipment or to conduct a forensic examination of the computer equipment;

10.  Records of or information about Internet Protocol addresses used by the computer equipment;

22-MJ-5180-JGD

      11.      Records of or information about the computer equipment's Internet activity;and

      12.      Contextual information necessary to understand the evidence described in this attachment.

    K.     Records, information, and items relating to the ownership or use of computer equipment and other electronic storage devices found in or on the SUBJECT PREMISES; and

    L.     Records and tangible objects relating to the ownership, occupancy, or use of the SUBJECT PREMISES (including utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts, and check registers).

II.    All computer hardware, computer software, computer-related documentation, and storagemedia. Off-site searching of these items shall be limited to searching for the items describedin Paragraph I.

## **DEFINITIONS**

For the purpose of this warrant:

    A.     "Computer equipment" means any computer hardware, computer software, computer-related documentation, storage media, and data.

    B.     "Computer hardware" means any electronic device capable of data processing (suchas a computer, smartphone, cellular telephone, or wireless communication device);any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

    C.     "Computer software" means any program, program code, information or data

3

stored in any form (such as an operating system, application, utility, communication, and data security software; a log, history, or backup file; an encryption code; a username; or a password), whether stored deliberately, inadvertently, or automatically.

D.      "Computer related documentation" means any material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

E.       "Storage media" means any media capable of collecting, storing, retrieving, ortransmitting data (such as a hard drive, CD, DVD, or memory card).

F.      "Data" means all information stored on storage media of any form in any storage format and for any purpose.

G.      "A record" is any communication, representation, information, or data. A "record"may be comprised of letters, numbers, pictures, sounds, or symbols.

## **RETURN OF SEIZED COMPUTER EQUIPMENT**

If the owner of the seized computer equipment requests that it be returned, the governmentwill attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not  contain contraband and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If the computer equipment contains contraband, it will not be returned. If the computer equipment cannot be returned, agents will attempt to make available to the computer system's

4

owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband or the fruits or instrumentalities of crime.